JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Jeffrey Braun, appeals from Cuyahoga County Common Pleas Court judgment finding him guilty of aggravated burglary, aggravated robbery, and attempted murder, and sentencing him to twenty-one years in prison. For the following reasons, we affirm.
 {¶ 2} In November 2005, the Cuyahoga County Grand Jury indicted Braun on five counts: two counts of aggravated burglary, in violation of R.C.2911.11, with one-and three-year firearm specifications; two counts of aggravated robbery, in violation of R.C. 2911.01, with one-and three-year firearm specifications; and one count of *Page 3 
attempted murder, in violation of R.C. 2923.02/2903.02, with one-and three-year firearm specifications. Braun entered a plea of not guilty to the charges.
 {¶ 3} The case proceeded to a jury trial for co-defendants, Braun and John Shear.[1] The following evidence was adduced at trial.
 {¶ 4} The victim, Tom McDonald, testified that on Friday, October 28, 2005, he was drinking and "partying" at the bar downstairs; he lived above the bar. He agreed that by "partying," he meant "using some drugs." He finally went to bed around 3:00 or 4:00 a.m. He said that a bunch of people were still at his apartment when he went to bed.
 {¶ 5} When McDonald got up the next morning, his good friends, Larry Moore and Julie Drespling, were at his apartment. He did not remember if they had been there the night before. Other friends were also there, Mike who lived upstairs, McDonald's girlfriend Denise, and another woman, Brandy. Denise was still asleep in McDonald's bedroom and Brandy was asleep on the couch. The victim said that Moore and Drespling were there to get cocaine from him, which he gave them.
 {¶ 6} While McDonald was sitting with his friends, Braun and Roy Fitzer, who McDonald said he did not know at the time, knocked at the door. McDonald explained that the chain was still on the door, and he told them the party was over. They left. McDonald said they appeared to be "pretty buzzed," which made him *Page 4 
nervous. So, McDonald walked out on his balcony and saw Braun and Fitzer get into a grey, four-door "Olds" that Shear was driving. McDonald then saw them drive around his apartment building, which he explained is in the middle of a shopping plaza parking lot.
 {¶ 7} McDonald went back inside. About five minutes later, he heard someone breaking his door down. He saw Fitzer standing in his doorway with a gun. McDonald stated he ran toward Fitzer and grabbed the gun. McDonald also saw Braun standing behind Fitzer. Braun and Fitzer pushed McDonald into his kitchen. Braun began to hit McDonald on his back four times with a golf club, which left four bruises, imprints of the golf clubs, for a couple of weeks. This caused McDonald to let go of Fitzer's gun that he had been holding onto.
 {¶ 8} Immediately after McDonald let go of the gun, he was shot three times, first in his pelvis, then in his thigh, and then in his leg, right above his ankle. The first bullet went through his right abdomen, lodged in his spine, and is still there. The second bullet went in one side of his thigh and came out the other. It was more of a flesh wound. The third bullet hit him right above the ankle and broke both bones and left his foot dangling. He has to wear an apparatus now to keep his foot straight.
 {¶ 9} After McDonald had been shot, while he was lying on the floor, Braun lifted him up slightly so that he could reach in McDonald's pockets and take money from him. Braun then asked McDonald, "Where is the dope?" McDonald told *Page 5 
Braun, "I think you just killed me. I don't have no dope." Braun then said to Fitzer, "I think you just killed him. Come on, let's go."
 {¶ 10} McDonald was taken to Fairview Hospital by ambulance, and then had to be life flighted to Cleveland Metro Hospital. He had to have surgery almost immediately, which lasted nine hours. Surgeons could not remove the bullet that lodged in his spine. As of the trial, the bullet had caused nerve damage "all the way down [his] leg and into [his] foot." He had to remain in the hospital for three and a half weeks after the shooting.
 {¶ 11} McDonald further testified that sometime within the two weeks prior to the shooting, he had learned that Shear was looking for him because Shear's girlfriend, Angie, had been hanging out at McDonald's house partying.
 {¶ 12} Drespling testified that she had been friends with McDonald for about ten-and-a-half years. On Saturday, October 29, 2005, Drespling and her boyfriend, Moore, arrived at McDonald's home around 10:00 or 10:30 a.m. McDonald was still sleeping. McDonald's upstairs neighbor, Mike, was there. There was also a woman sleeping on the couch, who Drespling did not know and there were two men sitting at McDonald's table, who Drespling did not know at the time, but later learned were Fitzer and Braun.
 {¶ 13} Drespling stated that they stayed at McDonald's for about an hour, but left when Mike asked them to because McDonald was getting up. Drespling and *Page 6 
Moore gave Braun and Fitzer a ride to Storer Avenue. After that, they drove back to McDonald's apartment.
 {¶ 14} When they got back, McDonald was awake and sitting at the table with Mike. A woman was still sleeping on the couch and Denise, McDonald's girlfriend, was sleeping in McDonald's bedroom. They were all hanging out, getting ready to watch the Ohio State game. Someone knocked on McDonald's door at some point and she heard him say, "No, I don't have anything. Go away. I'll call you later."
 {¶ 15} After that, McDonald told Mike to go get beer, so he did. Five minutes after Mike left and about ten minutes after McDonald had told someone at the door to go away, "the door got kicked down." Fitzer came in first with a gun, and Braun was behind him. She recognized them because she had just given them a ride about an hour previously. She saw them walk in and Fitzer "shot twice immediately, yelled, `Where is the money?' and then, [her] boyfriend pushed [her] into Tom's bedroom, where [she] hid underneath his bed." From the bedroom, she could hear struggling, more gunshots, and heard a man say, "He's dead, you killed him, let's get out of here." She then heard McDonald say, "I'm dying here. Someone please help me." Drespling also stated that she had never seen Braun or Fitzer at McDonald's apartment prior to this incident.
 {¶ 16} On cross-examination, Drespling said that she did not see Braun hit McDonald with a golf club, nor did she hear Braun say anything. She also recalled *Page 7 
that McDonald's "supplier" stopped by at some point before the shooting, and that he and McDonald went into another room.
 {¶ 17} Moore testified after Drespling. He stated that he had been friends with McDonald for about five years. He then corroborated Drespling's testimony.
 {¶ 18} James Raynard ("Detective Raynard"), a detective for the city of Cleveland Police Department, testified that he investigated the crime scene on October 29, 2005. He photographed the scene and collected evidence. He found eight "items of interest." He identified thirty photographs that he had taken at the scene, including one of golf clubs, bloody paper towels, a damaged interior bolt on the door, and a cellophane baggie with a substance in it that looked like cocaine. He also found blood on the back stairway, a chair, and a pair of jeans.
 {¶ 19} Denise Smith testified that McDonald was a former boyfriend of hers, and that they are good friends now. She was dating McDonald at the time of the shooting. She said that she arrived at McDonald's apartment sometime after midnight on October 29, 2005. McDonald was asleep at the table. Brandy was also there, snorting cocaine. Smith said that she woke McDonald up and put him in bed. She then went back to the table. Brandy was still there and Shear's girlfriend, Angie, stopped over. Smith said that she had just met Angie.
 {¶ 20} Brandy and Angie told her that Shear was in the parking lot. Smith said she heard and saw Shear "[p]ealing out" and "[d]riving fast" around 5:00 a.m. He was driving that way because he was upset that Angie was at McDonald's *Page 8 
apartment. Angie appeared to be nervous and scared; she left around 7:00 a.m. Smith did not go to bed until about 9:00 a.m. Smith stated that she woke up to the sound of gunshots. Soon after that, Drespling and Moore came into the bedroom and would not let her leave. When it became quiet, they went out to help McDonald.
 {¶ 21} Smith confirmed that at some point between the October 27 and October 29, 2005, she saw McDonald sell drugs to "John Shear, or Jeff Braun."
 {¶ 22} Ray Diaz ("Detective Diaz"), a detective for the city of Cleveland Police Department, testified that he and Detective Sweeney were assigned to investigate this case. He never went to the actual crime scene because the crime scene unit handles that part of an investigation. After Braun and Fitzer were apprehended, Detective Diaz read Braun his rights. Braun stated that he did not shoot anybody and after that, would not talk to Detective Diaz. He also interviewed McDonald at the hospital, and talked to Drespling and Moore. They never interviewed Brandy, because the officers were never able to locate her.
 {¶ 23} The state rested its case-in-chief. At the close of the state's case, Braun moved for a Crim.R. 29 acquittal, which the trial court denied.[2] Braun then rested his case, and renewed his Crim.R. 29 motion, which the trial court again denied. *Page 9 
 {¶ 24} The jury found Braun guilty of counts one and two, aggravated burglary, counts three and four, aggravated robbery, and count five, attempted murder, with a one-year firearm specification. The jury found Braun not guilty of the remaining one and three-year firearm specifications that were attached to the two counts of aggravated burglary and the two counts of aggravated robbery.
 {¶ 25} The trial court sentenced Braun to the maximum of ten years in prison on each felony one count of aggravated burglary, and merged them for purposes of sentencing; ten years in prison on each felony one count of aggravated robbery, and merged them for purposes of sentencing; and then ordered that they be served concurrently to one another, for a total of ten years. The court further sentenced Braun to the maximum of ten years in prison on the felony one attempted murder, to be served consecutive to the other counts, plus an additional one-year term for the firearm specification, to run prior to and consecutive with the previous terms, for an aggregate sentence of twenty-one years in prison. The trial court also informed Braun that he would be subjected to five years of post-release control when he was released from prison.
 {¶ 26} It is from this judgment that Braun appeals, raising the following three assignments of error:
 {¶ 27} "[1.] The sufficiency of the evidence was inadequate for conviction.
 {¶ 28} "[2.] The manifest weight of the evidence was insufficient for conviction. *Page 10 
 {¶ 29} "[3.] Trail [sic] court erred in failing to grant a motion for mistrial due to `prior record' testimony."
 {¶ 30} In his first assignment of error, Braun does not argue that the evidence was not sufficient to convict him of the aggravated burglary or aggravated robbery convictions. He maintains, however, that it was insufficient to convict him of attempted murder.
 {¶ 31} In State v. Thompkins (1997), 78 Ohio St.3d 380, 386, the Supreme Court of Ohio explained that sufficiency of the evidence and the weight of the evidence are not synonymous legal concepts. They are "both quantitatively and qualitatively different." Id. The high court further explained:
 {¶ 32} "With respect to sufficiency of the evidence, `sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support a jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R.29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955),162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982),457 U.S. 31, 45 * * *, citing Jackson v. Virginia (1979), 443 U.S. 307
* * *." (Parallel citations omitted.) Id. at 386-387. *Page 11 
 {¶ 33} When determining sufficiency of the evidence, we must consider whether, after viewing the probative evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense proven beyond a reasonable doubt. State v.Shaffer, 11th Dist. No. 2002-P-0133, 2004-Ohio-336, at _17. Further, we note that the verdict will not be disturbed on appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact. State v. Dennis (1997),79 Ohio St.3d 421, 430.
 {¶ 34} Braun was convicted of attempted murder, a violation of R.C.2903.02(B), which provides, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."
 {¶ 35} R.C. 2923.03(A)(2), complicity, provides in pertinent part, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]"
 {¶ 36} R.C. 2923.02 defines "attempt" as:
 {¶ 37} "(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense."
 {¶ 38} Finally, R.C. 2901.22 provides in part: *Page 12 
 {¶ 39} "(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 40} Thus, reading the foregoing statutes in pari materia, in order to convict appellee of attempted murder, the prosecution had to prove, beyond a reasonable doubt, that: (1) Braun and Fitzer had the specific intention, or purpose, to kill McDonald, and (2) Braun somehow aided Fitzer in committing the offense of attempted murder.
 {¶ 41} We note that the mere presence of Braun at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor. See, generally, 21 American Jurisprudence 2d 324, Criminal Law, Section 167; Columbus v. Russell (1973),39 Ohio App. 2d 139.
 {¶ 42} However, as the facts demonstrate, Braun was much more than a passive spectator who was "merely present" at the scene of the gun battle. Rather, the record shows that Braun actively assisted Fitzer in the attempted murder of McDonald. The evidence shows that Braun and Fitzer broke into McDonald's home by force. Fitzer had a gun in his hand. Braun was right behind him. McDonald testified that he ran to Fitzer, grabbed the gun, and held onto it until Braun began to hit him in the back with a golf club. This caused him to let go of the gun, and he was shot three times by Fitzer. McDonald further testified that while he was lying on the *Page 13 
floor, obviously bleeding and in pain from three gunshot wounds, Braun picked him up and moved him slightly so that he could steal money that was in McDonald's pockets. Other witnesses also testified that Fitzer and Braun broke into McDonald's apartment in concert.
 {¶ 43} Thus, there is sufficient evidence, direct and circumstantial, from which reasonable minds could infer that Braun was well aware of the gun that Fitzer had in his possession. Moreover, Braun made it possible for Fitzer to shoot McDonald by hitting him with the golf club, causing McDonald to let go of the gun. These intentional actions by Braun clearly aided Fitzer in the murder attempt.
 {¶ 44} Therefore, the state provided sufficient evidence to convict Braun of attempted murder beyond a reasonable doubt. Accordingly, Braun's first assignment of error is not well-taken.
 {¶ 45} In his second assignment of error, Braun argues that his convictions were against the manifest weight of the evidence. Again, Braun does not challenge his aggravated burglary or robbery convictions. He contends that his conviction for attempted murder was against the manifest weight of the evidence.
 {¶ 46} With respect to manifest weight of the evidence, the Supreme Court has stated:
 {¶ 47} "[although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. [Robinson, supra, at 487]. *Page 14 
Weight of the evidence concerns `the inclination of the greater amountof credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greateramount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 {¶ 48} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. [Tibbs, supra, at 42]. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175
* * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')." Thompkins, supra, at 387.
 {¶ 49} In addition, when assessing witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of *Page 15 
fact." State v. Awan (1986), 22 Ohio St.3d 120, 123. The factfinder is free to believe all, part, or none of the testimony of each witness appearing before it. Warren v. Simpson (Mar. 17, 2000), 11th Dist. No. 98-T-0183, 2000 Ohio App. LEXIS 1073, at 3.
 {¶ 50} With this standard in mind, we conclude that Braun's conviction for attempted murder was not against the manifest weight of the evidence. Again, the evidence overwhelmingly showed that Braun and Fitzer acted in concert, trying to get into McDonald's apartment by knocking on the door, and then breaking into it when he did not let them in. Fitzer walked in first with a gun in his hand, with Braun right behind him. Moreover, Fitzer may have pulled the trigger, but he would not have been able to do so without Braun's aiding and abetting.
 {¶ 51} Braun argues that because "his conviction rests solely on the testimony of a drug abuser/dealer," and that "other witnesses who were at McDonald's apartment when he was attacked are all admitted drug users as well," the evidence weighed heavily against his conviction. We disagree. As Braun himself stated, "the weight of the evidence and the credibility of witnesses are primarily for the trier of fact." The jury, as the factfinder, was free to believe all or part of the testimony presented at trial. They obviously chose to believe all of it. We cannot conclude that this was a case where the jury clearly lost its way and created a manifest miscarriage of justice. As such, Braun's second assignment of error is without merit. *Page 16 
 {¶ 52} In his third assignment of error, Braun argues that the trial court erred when it did not grant him a mistrial after Officer Diaz testified that he searched for Braun's and Shear's aliases in the police computer. Braun maintains that this was highly prejudicial to him because only "hard core" criminals have aliases and thus, a fair trial was no longer possible.
 {¶ 53} Our standard of review when reviewing a trial court's ruling on a motion for mistrial is abuse of discretion. State v. Goerndt, 8th Dist. No. 88892, 2007-Ohio-4067, at _20. An abuse of discretion is more than an error of law or of judgment; rather, it implies the trial court's decision is unreasonable, arbitrary or unconscionable. Id., citing State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 54} "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected; this determination is made at the discretion of the trial court. The granting of a mistrial is only necessary when a fair trial is no longer possible. Thus, the essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely or materially affected." (Citations omitted.) Goerndt at _21.
 {¶ 55} In State v. Widner (1981), 68 Ohio St.2d 188, the Supreme Court discussed the high standard that must be met before a trial court should declare a mistrial: *Page 17 
 {¶ 56} "In evaluating whether the trial judge acted properly in declaring a mistrial, the court has been reluctant to formulate precise, inflexible standards. Rather, the court has deferred to the trial court's exercise of discretion in light of all the surrounding circumstances:
 {¶ 57} ?`(* * *) We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes. (* * *) But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.' * * *" Id. at 190.
 {¶ 58} In the case at bar, during the state's direct examination of Officer Diaz, he stated that he was assigned to the case and read the initial report. From the initial report, he learned that witnesses had said the two suspects were known as "JB and Cheese." The prosecutor asked him how he was able to obtain Braun's and Shear's names from the aliases given and he replied, "In our computer system, our RMS system, we have what is called a global inquiry. Whenever a report is *Page 18 
made about a person, if they have an alias, or use a street name — [.]" At that point, Braun's counsel objected.
 {¶ 59} A sidebar discussion was then had. The trial court informed defense counsel that it would give a curative instruction, but defense counsel declined the instruction. After the sidebar, the prosecutor continued with Officer Diaz's direct examination. The prosecutor did not ask anything else about the aliases. At the end of the day, Shear's defense counsel moved for a mistrial, which Braun's counsel joined. The trial court denied the motion.
 {¶ 60} In State v. McLindon (Apr. 15, 1992), 1st Dist. No. C-850868, 1992 Ohio App. LEXIS 1955, the prosecutor was questioning a police officer if the defendant had used his middle name when acknowledging in writing that the officer had read him his rights. When the prosecutor asked, "Did he put in his middle name, Willie Clarence[,]" the police officer answered, "I don't know what his middle name is; he has so many aliases in the computer." Id. at 15. Defense counsel immediately moved for a mistrial, which the trial court denied. The appellate court affirmed, relying heavily on one of previous decisions, State v.Atkins (Apr. 17, 1985), 1st Dist. No. C-840367, 1985 Ohio App. LEXIS 6428.
 {¶ 61} In Atkins, the prosecutor attempted to impeach the defendant's credibility by asking him questions about his past criminal record. While questioning, a computer print-out of the defendant's criminal record "unravelled in front of him, dropping some six feet from the top of the lectern where he stood to the floor below." *Page 19 
Id. at 9. The trial court refused to declare a mistrial. The appellate court, affirming the trial court, reasoned, "[t]he potential for unfairness that was undoubtedly created * * * was not, standing alone, so compelling that it required the sort of drastic remedial intervention characteristic of an order declaring a mistrial or granting a new trial. Something more was needed to cross the threshold into actual prejudice, and that was, in our estimation, a showing that one or more members of the jury actually saw the contents of the print-out and either read at least part of the document or understood its significance." Id. at 10. The appellate court would not speculate as to the impact of the computer print-out on the jury. Id. at 11.
 {¶ 62} In order for Braun to prevail, we must presume that the jury inferred from Officer's Diaz's testimony that because Braun allegedly had an alias, he must have had a criminal record. After reviewing the record, we conclude that the officer's comments did not rise to the level necessary that would adversely affect Braun's substantial rights and cause him to receive an unfair trial. Officer Diaz's testimony was not as potentially prejudicial to Braun as the conduct and testimony in Atkins and McLindon was to the defendants in those cases. Accordingly, Braun's third assignment of error lacks merit.
 {¶ 63} Having concluded that Braun's three assignments of error are without merit, we affirm the judgment of the Cuyahoga County Court of Common Pleas.
It is ordered that appellee recover from appellant costs herein taxed.
 The court finds there were reasonable grounds for this appeal. *Page 20 
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KENNETH A. ROCCO, P.J., and ANN DYKE, J., CONCUR.
[1] The indictment also charged Roy Fitzer as a co-defendant, but he did not go to trial with Braun and Shear.
[2] The trial court granted Shear's Crim.R. 29 motion after finding that there was no evidence that Shear dropped Fitzer and Braun off at McDonald's house or drove the getaway car. All counts against Shear were dismissed and the trial proceeded with Braun as the remaining defendant. *Page 1